IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

---

AIR TRANSPORT ASSOCIATION OF AMERICA, INC. d/b/a AIRLINES FOR AMERICA,

        Plaintiff,

        v.

SUSAN CORBIN, in her official capacity as Director of Labor and Economic Opportunity,

        Defendant.

Case No. _____

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

---

1. Plaintiff Air Transport Association of America, Inc. d/b/a Airlines for America ("A4A"), by and through its undersigned counsel, brings this Complaint for Declaratory and Injunctive Relief against Susan Corbin, in her official capacity as Director of Labor and Economic Opportunity ("LEO"), and alleges upon knowledge with respect to itself and its own acts, and upon information and belief as to all other matters, as follows:

2. The Michigan Earned Sick Time Act (Mich. Comp. Laws §§ 408.961-74) (referred to herein as the "Michigan Law"), as applied to the Airlines,[1] is preempted by the Airline Deregulation Act of 1978 (49 U.S.C. §§ 41701-41726) (the "ADA"). The Michigan Law comprehensively regulates when and how Airline employees can be absent from work. For example, the Michigan Law (i) requires that employers in Michigan annually provide up to 72 hours of earned sick time for a broad range of reasons, (ii) prohibits employers from requiring an employee to provide documentation that earned sick time was used for an authorized purpose

---

[1] A4A's member carriers as a group are referred to herein as the "Airlines," and any one member carrier is referred to as an "Airline."

(*e.g.*, doctors' notes), and (iii) prohibits employers from factoring earned sick time use into any absence-control policy or attendance point system.  In these and other ways, the Michigan Law undermines the Airlines' generous and carefully crafted collective bargaining agreements ("CBAs") and company policies, which strike a balance between employee needs and the complexities of operating a 24-hours-a-day, 7-days-a-week nationwide network of air transportation.

3.      The ADA contains an express preemption clause that preempts laws like the Michigan Law.  In particular, the ADA "largely deregulated domestic air transport," *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 222 (1995), "to promote 'efficiency, innovation, and low prices' . . . through 'maximum reliance on competitive market forces,'" *Northwest, Inc. v. Ginsberg*, 572 U.S. 273, 280 (2014) (citation omitted).  To "ensure that the States would not undo federal deregulation with regulation of their own," *Rowe v. New Hampshire Motor Transport Association*, 552 U.S. 364, 368 (2008) (citation omitted), the ADA preempts state laws "*related to* a price, route, or service of an air carrier." 49 U.S.C. § 41713(b) (emphasis added).  The Supreme Court recognizes that this language expresses a "broad pre-emptive purpose." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383-84 (1992).  Here, the Michigan Law, as applied to the Airlines, is preempted by the ADA because it "relate[s] to" and has a "significant impact" on the Airlines' "price[s], route[s], or service[s]."  49 U.S.C. § 41713(b); *Morales*, 504 U.S. at 390.  Among other things, paid sick leave laws, like the Michigan Law, have caused and/or will cause an increase in employee absences, including because of an increase in employee use and abuse of sick leave, which in turn has had and/or will have a significant impact on various customer services provided by the Airlines, including and up to causing and contributing to flight delays and cancellations.

2

## NATURE OF THE ACTION

4.      A4A seeks a declaration, pursuant to 28 U.S.C. §§ 2201-2202, that the Michigan Law in its entirety, as applied to the Airlines, is preempted by the ADA because the Michigan Law relates to and has a significant impact on the Airlines' prices, routes, and/or services, and is therefore unenforceable by virtue of the Supremacy Clause of the United States Constitution.

5.      A4A also seeks a permanent injunction prohibiting enforcement of the Michigan Law against the Airlines.

## THE PARTIES

6.      Plaintiff A4A is a nonprofit corporation organized under the laws of the District of Columbia, with its principal place of business in Washington, D.C.  A4A advocates on behalf of nine federally regulated air carriers, which include six passenger carriers, Alaska Airlines, Inc. ("Alaska"), American Airlines, Inc. ("American"), Delta Air Lines, Inc. ("Delta"), JetBlue Airways Corp. ("JetBlue"), Southwest Airlines Co. ("Southwest"), and United Airlines, Inc. ("United"), and three cargo carriers, Atlas Air, Inc. ("Atlas"), FedEx Express ("FedEx"), and UPS Airlines ("UPS").  As of October 2025, U.S. airlines employed over one million workers across the globe, including more than 748,000 full-time equivalent workers and 282,000 part-time workers.[2]  Commercial aviation supports 5% of U.S. gross domestic product and more than

---

[2]      Bureau of Transportation Statistics, U.S. Dep't of Transp., https://transtats.bts.gov/Employment/ (updated November 10, 2025).

10 million U.S. jobs, including more than 56,000 jobs in Michigan.[3]  Commercial aviation also contributes $6 billion annually to Michigan's gross state product.[4]

7.      Among other things, A4A advocates for the Airlines on issues of safety, security, customer service, environment, energy, taxes, and economic growth.  A4A also works with the Airlines in legal, political, and regulatory arenas to foster a business and regulatory environment which promotes a safe, secure, and financially stable airline industry in the United States.

8.      All of the Airlines are federally regulated air carriers, and many operate domestic and/or international flights daily into and out of airports in Michigan (including the Detroit Metro Wayne County Airport ("DTW") and Grand Rapids Airport ("GRR").

9.      Defendant Susan Corbin is the Director of Labor and Economic Opportunity and named as a Defendant in her official capacity.  In her official role, she is charged with enforcement of the Michigan Law.  *See* Mich. Comp. Laws § 408.967(2).  The Department of Labor and Economic Opportunity is based in Lansing, Michigan.

### JURISDICTION AND VENUE

10.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337, because A4A's claims arise under the ADA and the Supremacy Clause of the United States Constitution.  *See* 49 U.S.C. § 41713; U.S. Const. art. VI, cl. 2.

11.     The Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, authorizes the declaratory and other relief sought herein.

---

[3]      *See* The Economic Impact of U.S. Civil Aviation:  2024 at 9, Fed. Aviation Admin. (Sep. 2024); The Economic Impact of U.S. Civil Aviation on the U.S. Economy at 9, State Supplement, Fed. Aviation Admin. (Sep. 2025) (hereinafter *State Supplement*).

[4]      *See State Supplement*, *supra* at 9.

12.     A4A has associational standing as an organization to bring claims on behalf of the Airlines for the declaratory and injunctive relief sought herein.  An organization has standing to sue on behalf of its members when:  "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Am. Canoe Ass'n.  v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 540 (6th Cir. 2004).

13.     A4A satisfies each of the three requirements for associational standing.  *First*, the Michigan Law is injuring (and will continue to injure) the Airlines with operations in Michigan by requiring those Airlines to either (i) take steps to modify the application of sick leave and other provisions of their respective attendance/reliability policies, CBAs, and/or company policies, and to modify the application of any doctors' notes requirements, or (ii) face the threat of enforcement activity by the Department of Labor and Economic Opportunity if they do not do so.  These injuries would be redressed by a favorable decision in this litigation because the Michigan Law would no longer apply to the Airlines.  *Second*, this litigation is germane to A4A's organizational purpose of advocating on behalf of the Airlines to ensure a safe, secure, and healthy U.S. airline industry.  *Third*, neither A4A's preemption claim nor the relief A4A seeks -- a judgment declaring the Michigan Law preempted and unenforceable as applied to the Airlines, and an injunction barring its enforcement -- requires the participation of A4A's individual members.

14.     Venue is proper in this Court under 28 U.S.C. § 1391(b), as this Court is located in the judicial district where the defendant resides and where a substantial part of the events or omissions giving rise to A4A's claims have occurred.

**THE AIRLINES' FLIGHT CREW AND THE SERVICES THEY PROVIDE**

15.     Each of the Airlines employs thousands of pilots and flight attendants, who work on flights throughout the United States and the world.  Flight crew[5] are highly mobile workers, who do not work regularly scheduled shifts.  The Airlines' flight crew are assigned to a particular airport or "base."  A base, also known as a "domicile," is the airport where flight crew begin and end their work assignments (also called "trips," "sequences," or "pairings").  The Airlines also allow flight crew to transfer between bases from month to month.  At least one A4A member has a flight attendant and pilot base in Michigan.  Additionally, even Airlines who do not have flight crew based in Michigan have flight crew who fly through Michigan (including taking off and landing at DTW and GRR).

16.     A flight crew member's "base" is not necessarily located in the same city or even the same state where they live, and it is common for flight crew based in one state to live in another state or even outside of the United States.  Flight attendants and pilots who are based in cities where they do not live are known as "commuters."  Commuters who do not live within driving distance of their base are allowed to fly for free on their own Airline, and sometimes on other Airlines as well, between their place of residence and their base.

17.     Because the vast majority of the flights operated by the Airlines in Michigan either begin or end in Michigan, but not both, flight crew based in Michigan do not spend all of their time working in Michigan.  These employees spend much of their work time in federally regulated airspace, and they often pass through multiple airports and states in the course of a single day, spending time on the ground in each location to prepare for their next flight or begin a layover at a local hotel until the day of their next flight.

---

[5]     As used herein, the term "flight crew" refers to pilots and flight attendants.

6

18. Federal regulations require the Airlines to have a minimum number of pilots and flight attendants on board the aircraft before any passengers may board or the aircraft may take off. *See* 14 C.F.R. §§ 121.385, 121.391. Most of the Airlines' flights operate with the minimum staffing level for pilots and flight attendants.

19. Flight crew provide critical services to the Airlines' passengers to ensure a safe, reliable, and on-time operation. For example, after boarding, pilots are responsible for the safe and on-time transport of all passengers and crew on board their flights and, among other things, flight attendants are responsible for assisting passengers with boarding, ensuring the safety of and providing service to the Airlines' passengers on-board, and preparing aircraft cabins for take-off and landing.

20. Thus, both on-time boarding and on-time departures depend on the on-time arrival of pilots and flight attendants at the gate.

## GROUND CREW AND THE SERVICES THEY PROVIDE

21. Each Airline also employs thousands of ground crew members across the country, often with several hundred or more working at the airports where each Airline has its largest operations. Several of the Airlines have significant complements of ground crew employees in Michigan. Ground crew employees often live near the airport where they work, and are typically considered in four groups: above-the-wing, below-the-wing, maintenance, and cargo.

22. Above-The-Wing. As a general matter, above-the-wing ground employees work in a customer service role and are typically those employees whom a passenger will encounter when they arrive at the airport or at the gate. These employees routinely provide services to passengers at the ticket counters and kiosks, at the gates, in premium service clubs, or in baggage service offices.

23.    In particular, the services provided by above-the-wing employees typically include:

(a)    Services at the ticket counters, which include:  (i) checking in passengers; (ii) checking and processing passengers' bags; (iii) assisting with passenger check-in at the kiosks; and (iv) otherwise assisting passengers with travel bookings and reservations.

(b)    Services at the gates, which include:  (i) making seat-assignment and reservation changes requested by passengers; (ii) assisting passengers with connecting flight information; (iii) assisting passengers with any disability accommodations or issues relating to children or pets; (iv) scanning boarding passes; (v) meeting planes when they arrive; and (vi) otherwise assisting with passenger boarding and deplaning, including positioning the jet bridge to assist passengers in deplaning the aircraft.

(c)    Services at premium service clubs, which include:  (i) checking passengers into the premium service clubs; (ii) assisting the global, business and frequent flyer passengers with their travel needs, including booking club and conference rooms; (iii) assisting with frequent flyer program enrollment; and (iv) providing food and beverages to club and lounge customers.

(d)    Services at baggage service offices, which include assisting arriving passengers when their bags have been mishandled or are missing, or have arrived early.

24.    Below-The-Wing.  As a general matter, below-the-wing employees largely work on the ramp (*i.e.*, where a departing or arriving aircraft is parked for loading, unloading, fueling, and servicing) and in baggage rooms, and perform a variety of services (many of which require specialized training and qualifications), including:

(a)    Baggage loading services, which include:  (i) working in the bag room sorting, scanning, and loading bags onto the proper baggage carts to ensure they are loaded on the correct aircraft; (ii) transporting bags from the bag room to the aircraft; (iii) loading bags and cargo onto the aircraft; and (iv) ensuring that the aircraft is properly loaded and has a safe weight balance.

(b)    Baggage unloading and transfer services, which include unloading bags and cargo from aircraft arriving in Michigan and delivering the bags to other planes if the passengers have connecting flights or to the carousel for passenger pick up if Michigan is their final destination.

(c)    Towing services, which include:  (i) towing aircraft from gate-to-gate to ensure that the aircraft are in the proper position for their next flight; and (ii) repositioning aircraft from the gates to maintenance hangars or hard stands (often at night).  Additionally, during the colder months, this service can include an employee monitoring the repositioned aircraft overnight to ensure that the aircraft stays warm.

(d)    De-icing services, which include de-icing the aircraft in the winter.  De-icing is a specialized role that requires employees to complete training.

(e)    Water and lavatory services, which include:  (i) ensuring that each aircraft's utilities are ready for the next flight; (ii) servicing the potable water tank on the aircraft; and (iii) removing waste from the aircraft lavatories prior to take off.  These services can require specialized training.

(f)    Taxiing services, which include:  (i) assisting aircraft to taxi into and out of the gates on arrival and departure, respectively; (ii) assisting aircraft to safely park at the gates; and (iii) directing the aircraft to the gate after landing.

25.    <u>Maintenance</u>.  The Airlines also employ maintenance, mechanic, or "tech ops" employees (collectively referred to as "maintenance" employees).  As a general matter, maintenance employees largely work either at the terminal or in aircraft hangars, and perform a variety of services (nearly all of which require at least some special qualifications and/or training), including coordinating and/or performing maintenance or repairs on aircraft, aircraft equipment, and various ground service equipment.  A significant portion of the maintenance that employees perform occurs overnight:  for example, maintenance employees perform scheduled or otherwise required services on aircraft (*e.g.*, brake and fuel line repairs) to ensure that the aircraft can be available the next day.  Maintenance employees also respond to issues that arise during pre-flight checks performed by flight and below-the-wing ground crew, many of which must be resolved prior to an aircraft's departure.

26.    <u>Cargo</u>.  The Airlines also provide specialized cargo services, transporting a wide variety of cargo on passenger flights.  These services require specially trained employees to

accept, handle, store, pack, and move cargo.  Cargo employees are often divided into specialized roles, including front office agents who interact with customers and process documentation, warehouse employees who stage and secure freight, and drivers who transport cargo to and from aircraft.

27.    The numerous services provided by ground crew are also critical to the on-time boarding and on-time departures/arrivals of flights.

### THE COLLECTIVE BARGAINING AGREEMENTS AND COMPANY POLICIES THAT APPLY TO AIRLINE EMPLOYEES ARE GENEROUS AND COMPREHENSIVE

28.    The employment terms of the Airlines' flight crew and ground crew are set forth in detailed CBAs and/or company policies.

29.    All of the Airlines operating in Michigan have CBAs in place for at least some of their employees who work in Michigan.  For example, Delta has a CBA with its pilots based in Michigan and this CBA also is nationwide in scope, and American and Southwest each have CBAs with their ground crew in Michigan and these CBAs are nationwide in scope.  These CBAs are extensively negotiated by the union representing a specific group of employees (*e.g.*, pilots), on one side, and the employer-Airline, on the other side.  Paid sick leave and other paid time off has long been the subject of extensive collective bargaining.  Those negotiations and the related Airline policies/practices have reflected a delicate balance between the needs of Airline employees to have paid time away from work and the needs of Airlines to have adequate staffing to provide transportation services 24 hours a day, seven days a week, 365 days a year (including, for example, on holidays).  Once a union and Airline tentatively reach agreement on a CBA -- including, but not limited to, provisions relating to paid sick leave and other paid time off -- the union generally submits the proposed CBA to the employees for a membership ratification vote.

Once ratified, the CBA—and all of the negotiated terms, rules, and conditions—goes into effect for the work group(s) it covers.

30.     Delta's flight attendants and ground crew employees are not represented by unions.  As a result, the employment terms for these employees are generally determined by nationwide Delta policies rather than CBAs.

31.     The purpose of the CBAs and company policies is to create a uniform set of work rules that will apply to all employees in a given work group (*e.g.*, flight attendants) on a nationwide basis, regardless of where the employees live or work.  In this way, the CBAs and company policies are designed to ensure uniformity, predictability, and fairness across the Airlines' networks in a number of important areas, including (i) scheduling, (ii) trip and shift trading, (iii) vacation, (iv) other time off, and (v) sick time.  These CBA provisions and company policies also are designed to provide flexible and generous time off options to employees.

32.     *Scheduling*:  The work schedules of the Airlines' employees are generally determined by seniority-based bidding processes.  In the case of flight attendants and pilots, they typically bid for their schedules 30 to 60 days in advance based on dozens of criteria, including the number of days or hours they would like to work in a month, the days they would like to have off, the length of their trips (*e.g.*, trips that span one or multiple days), the cities where they would like to lay over, the other pilots and flight attendants with whom they would like to fly, and the need to observe federal regulations concerning minimum rest periods.  For many of the Airlines, flight attendants and pilots do not work standard 5-day, 40-hour work weeks.  For example, crewmembers at Delta, based on their seniority and ability to work on long-distance flights, may be able to achieve their expected monthly work hours in as few as 10 days per month.  Ground crew typically bid for their schedules based on their preferred work days, days

off, shift times, work areas (*e.g.*, ramp, bag room, ticket counter, and gates), and, where applicable, special qualifications.

33.    ***Trip and Shift Trading***:  Once their work schedules are initially set by the bidding processes, the Airlines' employees can (and frequently do) trade their trips and shifts with other employees.  For example, American ground crewmembers are able to trade shifts up to 4 p.m. the day before the shift is scheduled to begin.

34.    ***Vacation***:  Vacation amounts vary by seniority, but employees across the Airlines (both flight crew and ground crew) typically accrue between one week of vacation (usually for employees with less than one year of service) to more than a month of vacation per year.  To ensure that the Airlines maintain adequate staffing levels to safely and reliably operate their networks year round, the Airlines' CBAs and company policies provide detailed procedures by which employees may bid for vacation time.

35.    ***Other Leaves of Absences***:  In addition to vacation time, the Airlines' employees have numerous other ways to take time off from work, including personal, family or medical leaves of absences, and unpaid days off.

36.    ***Sick Time***:  The Airlines provide flight crew and ground crew generous paid sick leave benefits.  For example, pursuant to the CBA, pilots at Delta receive between 50 and 270 hours of sick leave per year, depending on seniority.  Sick leave for Delta pilots can be used only for a pilot's own illness or injury.  As another example, American's and Southwest's ground employees can accrue eight hours of paid sick leave per month, up to 96 hours per year, depending on the workgroup.  At Southwest, employees can accumulate up to 2,400 hours of paid sick leave at a time; and at American, employees can accumulate up to 1,600 hours of paid

sick leave at a time.  Ground crew are generally allowed to use accrued sick leave only for the employee's own illness or injury.

37.    With respect to its flight attendants and ground crew, Delta provides them with "Paid Personal Time" ("PPT").  PPT can be used for any kind of absence, including illness, personal, and family needs.  Delta ground employees and flight attendants can accrue up to 56 hours of PPT per year and accumulate 168 hours of PPT.  Scheduled PPT is time that is away from work and approved prior to the day of the absence.  Unscheduled PPT is time away from work that has not been approved in advance and can only be taken when an employee is too ill to work or they have an emergency need to be away from work.  If an employee's accrued but unused PPT is more than 168 hours, then the accrued but unused PPT hours are converted into "Certified Time."  Employees can accrue up to 150 days of Certified Time, which the employee can use for extended absences, including for illness.

38.    Many of the Airlines also maintain attendance and reliability policies for flight crew and ground crew.  The purpose of these policies is to allow the Airlines to monitor whether flight and ground crews are coming to work when scheduled, to make sure the Airlines are able to properly staff their flights, and to deliver on-time transportation and a satisfactory customer experience.

39.    The attendance policies aim to achieve these objectives with two primary accountability tools:  (i) points systems that can potentially lead to corrective action, and (ii) the ability to request doctors' notes to substantiate employees' use of paid sick leave.

40.    Points Systems:  Most of the Airlines' attendance policies assess points for each occurrence of sick leave or other unplanned absence, with a single "occurrence" spanning one or more days.  The number of points per occurrence can vary based on the amount of notice

13

employees provide for their absence.  For example, the points system for ground employees at Southwest ranges from 0.5 points for arriving late to work to two points for not showing up to work when scheduled.

41.    Ultimately, the points assessed under the Airlines' attendance policies can factor into the Airlines' progressive discipline policies, which typically start with a series of oral and written warnings (but only after less formal counseling has not worked) and can progress up to termination in very rare circumstances.

42.    Doctors' Notes:  In addition to the points systems contained in the Airlines' attendance policies, most of the Airlines can also request a doctor's note in certain circumstances.

43.    Given the impracticality of investigating sick leave abuse on a case-by-case basis, some of the Airlines can (and do) require doctors' notes from any employee who calls out sick during certain "critical coverage" periods or during "sick leave emergencies."  As one example, Delta can require certification from any flight attendant who calls out on certain holidays, including Thanksgiving, Christmas, New Years, and the Fourth of July.

44.    Additionally, the CBA for Delta's pilots requires that pilots who have used more than 120 hours of sick leave in a year provide a doctor's or qualified health care professional's certificate for each additional sick occurrence.

45.    As another example, at Southwest, whenever a "sick leave emergency" or "state of emergency" is declared for a particular employee group -- *i.e.*, when Southwest is experiencing higher than normal sick calls for an employee group that threatens the reliability of its operations -- employees who call out sick are required, with a few limited exceptions, to go to a company doctor to have their illness verified.

14

## THE MICHIGAN LAW

46. In September 2018, the Michigan Legislature adopted the Michigan Law as a ballot initiative.

47. In November 2018, during the same legislative session, the Michigan Legislature voted to amend the Michigan Law.

48. On or about July 31, 2024, the Michigan Supreme Court held that amending the Michigan Law during the same legislative session in which it was adopted was unconstitutional, and ordered the Michigan Law to be reinstated in its original form. *See Mothering Just. v. Att'y Gen.*, 10 N.W.3d 845 (Mich. 2024).

49. On or about February 20, 2025, the Michigan Legislature passed amendments to the Michigan Law, which, by court order, was set to take effect on February 21, 2025. Michigan Governor Gretchen Whitmer signed the amendments into law on February 21, 2025.

50. The Michigan Law imposes a comprehensive and pervasive paid sick leave benefit scheme on employers with employees in Michigan, including the Airlines.

51. The Michigan Law defines an employer as "any person, firm, business, educational institution, corporation, limited liability company, government entity, or other entity that employs 1 or more individuals." Mich. Comp. Laws § 408.962(g). The Michigan Law, however, specifically excludes the federal government from its definition of "[e]mployer." *Id.*

52. The Michigan Law defines an employee as "an individual engaged in service to an employer in the business of the employer." Mich. Comp. Laws § 408.962(f).

53. The Michigan Law requires employers, such as the Airlines, to provide their employees in Michigan with "earned sick time." Mich. Comp. Laws § 408.963(1).

54. Employers must allow their employees in Michigan to accrue "1 hour of paid earned sick time for every 30 hours worked." Mich. Comp. Laws § 408.963(3). The Michigan

15

Law states that employees "covered under 29 CFR 825.801 [are] assumed to have worked not less than 40 hours in each workweek."  Mich. Comp. Law § 408.963(11)(b).  That regulation (29 CFR § 825.801) applies to "airline flight crew employees."

55.     Under the Michigan Law, employees began accruing earned sick time on the date the Michigan Law went into effect—*i.e.*, February 21, 2025—and may use accrued earned sick time as soon as it is accrued.  Employees hired after the Michigan Law went into effect begin accruing earned sick time immediately upon commencing employment, but an employer may require a newly hired employee "to wait 120 calendar days" before they can begin using their accrued time.  Mich. Comp. Laws § 408.963(6).

56.     Employees can use up to 72 hours of earned sick time per year, "unless the employer selects a higher limit."  Mich. Comp. Laws § 408.963(3).  The Michigan Law allows employees to use earned sick time in "1-hour increments or the smallest increment that the employer uses to account for absences."  Mich. Comp. Laws § 408.964(5).

57.     Generally, an employer must allow employees to carry over up to 72 hours of accrued but unused earned sick time into the following year.  Mich. Comp. Laws § 408.963(5). An employer does not, however, need to allow an employee to carry over their accrued but unused earned sick time if the employer "frontloads" the earned sick time by providing an employee with at least 72 hours of earned sick time at the beginning of the year.  *See* Mich. Comp. Laws § 408.963(5).

58.     Employees may use earned sick time for a broad range of reasons, including, but not limited to, the employee or the employee's family members' "mental or physical illness, injury, or health condition"; "medical diagnosis, care, or treatment of the employee's mental or physical illness, injury, or health condition"; "preventative medical care"; and needs, stemming

from domestic violence or sexual assault.  Mich. Comp. Laws § 408.964(1)(a)-(c).  The Michigan Law broadly defines "[f]amily member" to include, among other people, "[a]n individual related by blood to the employee" or "[a]n individual whose close association with the employee is the equivalent of a family relationship."  Mich. Comp. Laws § 408.962(2)(h)(vii)-(viii).  Employees may use earned sick time if a health authority or health care provider has "determined . . . that the employee's or employee's family member's presence in the community would jeopardize the health of others because of the employee's or family member's exposure to a communicable disease, whether or not the employee or family member has actually contracted the communicable disease."  Mich. Comp. Laws § 408.964(1)(e).  Employees may also use earned sick time to care for a child whose school or place of care has been closed "due to a public health emergency."  Mich. Comp. Laws § 408.964(1)(e).

59.  If an employee's need to use earned sick time is "foreseeable," then the employer cannot require more than seven-days' notice before the employee intends to use earned sick time. Mich. Comp. Laws § 408.964(2).  But if the need is "not foreseeable," then the Michigan Law permits employers to require employees to provide notice "as soon as practicable."  Mich. Comp. Laws § 408.964(3)(a).  If the need is not foreseeable, employers may also require employees to provide notice "[i]n accordance with the employer's policy related to requesting or using sick time or leave" if the employee was provided with a written copy of the policy and "[t]he employer's notice requirement allows the employee to provide notice after the employee is aware of the need for the earned sick time."  Mich. Comp. Laws § 408.964(3)(b).

60.  The Michigan Law prohibits employers from requiring an employee to provide documentation that earned sick time was used for an authorized purpose until the employee is absent for more than three consecutive workdays.  *See* Mich. Comp. Laws § 408.964(6).  For

17

earned sick time used for an employee's or the employee's family member's illness, reasonable documentation includes "[d]ocumentation signed by a health care professional indicating that earned sick time is necessary."  Mich. Comp. Laws § 408.964(6).  If an employer requires an employee to provide documentation, "the employer is responsible for paying all out-of-pocket expenses the employee incurs in obtaining the documentation."  Mich. Comp. Laws § 408.964(7).

61.     The Michigan Law prohibits employers from using an "absence control policy"— like the points-based attendance systems utilized by the Airlines for many workgroups—to "treat earned sick time . . . as an absence that may lead to or result in retaliatory personnel action." Mich. Comp. Laws § 408.966(3).

62.     The Michigan Law does not permit CBAs to waive its requirements.  If an employee is covered by a CBA that was in effect when the Michigan Law came into effect and that conflicts with the Michigan Law, then the Michigan Law will apply "beginning on the stated expiration date in the [CBA], notwithstanding any statement in the agreement that it continues in force until a future date or event or the execution of a new [CBA]."  Mich. Comp. Laws § 408.972(1)-(2).

63.     Many CBAs between airlines and employee groups have "stated expiration date[s]" that are coming up in the very near future.  For instance, the CBA between American and its below-the-wing employees has a "stated expiration date" of March 26, 2026.  Similarly, the CBA between Delta and its pilots has a "stated expiration date" of December 31, 2026.

64.     In addition, as noted *supra*, Delta's flight attendants and ground crew employees are not subject to CBAs, and thus Mich. Comp. Laws § 408.972(1)-(2) is inapplicable to them.

18

Put differently, the Michigan Law became applicable to Delta's flight attendants and ground crew employees on its effective date of February 21, 2025.

## THE MICHIGAN LAW HAS HAD AND/OR WILL HAVE A SIGNIFICANT IMPACT ON THE AIRLINES' PRICES, ROUTES AND/OR SERVICES

65.     The Michigan Law has had and/or will have a significant impact on the Airlines' prices, routes, and/or services.  This is because the Michigan Law has caused and/or will cause an increase in both use and abuse of sick leave and thereby has impacted and/or will impact the Airlines' prices, routes, and/or services, including and up to causing or contributing to flight delays and cancellations.

### The Michigan Law Has Increased And/Or Will Increase Employee Absences

66.     The Michigan Law encourages employees to use and potentially abuse sick leave, and thus to be absent from work more frequently, for several reasons.

67.     *First*, in many situations, the Michigan Law allows employees to take time off for additional reasons beyond those allowed under the applicable CBA or company policy, including, for example, to care for family members when the family member's school or place of care is closed due to a public health emergency.  Because employees are able to use earned sick time to take time off from work for additional reasons beyond those specifically permitted by the CBAs or company policies, the employees have used and/or will use earned sick time to take more time off from work than would be the case without the Michigan Law.

68.     *Second*, the Michigan Law's prohibition on counting absences towards employee discipline, *see* Mich. Comp. Laws § 408.966(2), interferes with the Airlines' enforcement of their nationwide attendance and reliability policies.  Specifically, the Michigan Law deprives the Airlines of one of their main accountability tools—*i.e.*, their points-based attendance programs— which assess points for employees' absences, including additional points for last-minute

absences.  Because points or other discipline cannot be assessed for an employee's use of leave under the Michigan Law, employees have been and/or will be absent from work more often and/or with less notice.

69.    *Third*, the Michigan Law's requirement that an employee must be absent for more than three consecutive work days before an employer can request medical verification of illness, *see* Mich. Comp. Laws § 408.964(6), substantially restricts the Airlines' ability to request medical documentation for absences.  By restricting the Airlines' ability to request medical documentation for absences, including during "sick leave emergencies" and other "critical coverage" periods, the Michigan Law has led and/or will lead to more employee absences.

**Increased Employee Absences Caused By The
Michigan Law Have Significantly Impacted And/Or
Will Significantly Impact The Airlines' Prices, Routes, And/Or Services**

70.    The increase in employee absences which has been and/or will be caused by the Michigan Law has significantly impacted and/or will significantly impact the Airlines' prices, routes, and/or services, including and up to causing or contributing to flight delays and cancellations, for several reasons:

71.    *First*, increased absences among flight crew caused by the Michigan Law has had and/or will have a significant impact on the Airlines' services, including by disrupting the Airlines' passenger boarding procedures and causing or contributing to flight delays and cancellations.  This is primarily because federal regulations require the Airlines to have a minimum number of pilots and flight attendants on-board before passengers may board the aircraft or the aircraft may take off.  *See* 14 C.F.R. §§ 121.385, 121.391.  Most of the Airlines' flights operate at the minimum staffing level for pilots and flight attendants.  Thus, for example, when a pilot or flight attendant calls out sick (including when using earned sick time) the Airlines must find a replacement flight crew member.  Even if a flight attendant or pilot calls out

20

for only a few hours of a trip (including when using earned sick time as allowed by the Michigan Law), the Airlines will have to replace the flight attendant or pilot for the remainder of their trip. If there is difficulty in finding a replacement pilot or flight attendant, the flight may be delayed; and if a replacement pilot or flight attendant cannot be found, the flight may be cancelled. Each of these service impacts directly and adversely affects the passengers' experiences while traveling with the Airlines.

72.    Moreover, because the Airlines' networks are based upon a complex array of connections and transfers, a delayed departure due to an unexpected flight crew member absence in one location can cause delays in other locations ("downline delays"). Specifically, when a plane arrives at its destination late, that delay can cascade in numerous ways, including (i) to the passengers on the delayed aircraft, who may now miss their connecting flights; (ii) to the delayed aircraft, which may cause its next scheduled flight to be delayed; (iii) to the delayed pilots, who may cause a delay in the next flight they were scheduled to operate (which may not even be on the same aircraft as before); and (iv) to the delayed flight attendants, who likewise may cause their next scheduled flights to be delayed (which may not even be on the same aircraft as before). And if delays cause pilots or flight attendants to be ineligible to act as flight crew on the next leg of their trip because they would exceed eligible work hours under FAA regulations or company policies (and thereby "time out"), substitute flight crew must be called in, further exacerbating the cascading effects.

73.    Even beyond downline delays, a Michigan-based flight attendant's or pilot's absence caused by the Michigan Law can have an adverse impact across an Airline's network for the additional reason that flight attendants and pilots can call out while out-of-base. For example, if an DTW-based flight attendant calls out sick at an airport where their Airline does

21

not have a flight attendant base, then the Airline will need to find a flight attendant living near that airport who might be able to cover the trip or, alternatively, the Airline will have to "deadhead" a flight attendant from another base (*i.e.*, flying the flight attendant to the airport from their base to cover for the absent flight attendant) or "draft" a flight attendant (*i.e.*, requiring a flight attendant to fly on their scheduled day off).  All of these options to respond to an out-of-base sick call could cause hours' long departure delays.  If the Airline is unable to find a flight attendant to cover that DTW-based flight attendant's out-of-base sick call, the flight would have to be cancelled.

74.     Finally, increased flight crew absences caused by the Michigan Law can have an impact on the operational reliability of a base, which in turn affects the viability of that base for an Airline.

75.     ***Second***, increased absences among ground crew caused by the Michigan Law has had and/or will have a significant impact on the Airlines' services, including and up to causing or contributing to flight delays and cancellations.

76.     For example, increased absences among above-the-wing ground crew employees has had and/or will have a direct and significant impact on Airline services provided at:

(a)     Ticket counters:  When there are fewer above-the-wing employees working at the ticket counter and kiosks, passengers are more likely to have to wait longer for assistance from an Airline employee, including for necessary tasks like printing boarding passes, checking baggage, or resolving other pre-departure issues.  When passengers are delayed at the ticket counter, they risk missing their flight altogether.  Moreover, when passengers are delayed at the ticket counter, they may be unable to timely check in their bags for departure.  Additionally, if there are high callouts among above-the-wing employees, Airlines may entirely shut down certain ticket counter locations.  This can inconvenience passengers by forcing them to find a different ticket counter location, causing longer lines at open ticket counters, and leading to delayed baggage drops and passengers.

(b)    Customer support areas:  When an Airline is experiencing high callouts among above-the-wing employees, they frequently pull employees from the customer support areas, sometimes referred to as help desks, in the terminals.  This can lead to the Airline closing the help desks, which negatively impacts customer service.

(c)    Gates:  When an Airline is short-staffed at the gates, that typically means that one gate agent will have to work a gate by themselves, even though this is typically a two-person job.  This can slow the boarding process and lead to a longer boarding time, which may ultimately affect a flight's on-time departure.  Moreover, short-staffing can affect the aircraft arriving at the short-staffed gates, because employees working at the gates assist with deplaning.

(d)    Premium service clubs:  When an Airline is short-staffed at the premium service clubs, passengers are more likely to experience longer waits to check in to the club as well as a lower level of service once inside.

77.    Likewise, increased absences among below-the-wing ground crew caused by the Michigan Law has had and/or will have a direct and significant impact on Airline services, including:

(a)    Baggage loading:  When the bag room is short-staffed, Airlines are sometimes forced to delay departures—mainly on international flights—in order to ensure that bags will make the plane, because otherwise the bags may not get to their destinations for significant periods of time.  On domestic flights, the bags may not get loaded before the aircraft departs.  Additionally, short-staffing in the bag room can result in misplaced bags, which also significantly impacts the Airlines' passengers.

(b)    Baggage transfer and unloading:  When below the wing agents responsible for baggage unloading or transferring are short-staffed, passengers are usually forced to wait a long time for their bags to arrive at the baggage carousel and it may take longer for bags to be transferred to connecting flights (and those bags may miss the connecting flight altogether).

(c)    Towing:  When towing or move teams, which are skilled positions, are short-staffed, it will generally take longer for aircraft to be moved from the hangar to the gates, or between gates, which can lead to delayed boarding and/or departures.

(d)    Taxiing and Deplaning services:  When a ramp team is short-staffed and unavailable to meet an arriving aircraft, this can lead to gate holds, which is when an aircraft is held on the tarmac for more than ten minutes, and,

23

among other things, that ground hold can delay connecting passengers and flight crew.

(e)    De-icing services:  When a de-icing operation is short-staffed, it will generally take longer for the aircraft to be de-iced, which can cause delayed departures.

78.    Similarly, increased absences among maintenance employees caused by the Michigan Law has had and/or will have a direct and significant impact on the Airlines' services. When an Airline's maintenance team is short-staffed, it will generally take longer to complete necessary maintenance tasks at the gate on aircraft scheduled shortly for departure.  This can cause delayed boarding and/or departures.  Short-staffing among a maintenance team will also lengthen the time it takes to perform scheduled or otherwise required maintenance during an aircraft's layover in Michigan, which can cause maintenance tasks to be deferred or flights to be delayed or cancelled until the required maintenance can be performed.  Additionally, when a maintenance team is short-staffed and thus unable to complete scheduled maintenance items, the number of aircraft that are "out of service" may increase, which can lead to flight delays or even cancellations.  Moreover, when a maintenance team is short-staffed, it may lead the maintenance team to "defer" a maintenance project which can impact the services the Airlines can provide on the flight (*e.g.*, a flight without working WiFi, or with one less operative lavatory, *etc.*).

79.    Increased absences among cargo agents caused by the Michigan Law has had and/or will have a direct and significant impact on the Airlines' services.  When cargo teams are short-staffed, cargo may not get loaded before the aircraft departs, or may be delayed in being unloaded from the aircraft to the Airlines' cargo customers.

80.    As noted above, the impact of increased ground crew absences caused by the Michigan Law on any one of the above-described services, alone or in combination, has affected and/or will affect yet another critical service of the Airlines:  the on-time departure of aircraft.

24

81.     The Airlines are forced to employ mitigation strategies to attempt to find coverage for employees who call out under the Michigan Law.  For example, the Airlines often have a subset of flight attendants who sit on "reserve" and may be available to fill in for missing flight attendants (*e.g.*, flight attendants who are sick, but also flight attendants whose earlier flights are delayed for any number of reasons) and sometimes have a subset of "bullpen" or "overage" ground employees to fill in for missing ground employees (*e.g.*, ground employees who are sick or out on vacation).  Otherwise, the Airlines attempt to use premium or incentive pay to attempt to encourage employees to pick up additional trips or shifts, or overtime pay to find coverage for sick calls.  Each of these strategies has its limitations and, alone or in combination, cannot and does not insulate the Airlines from the service impacts attributable to employee absences. Further, each of these strategies is significantly costly for the Airlines.  The Michigan Law requires the Airlines to incur even further costs for these mitigation strategies and/or to implement expensive changes to how they provide their services (*e.g.*, hiring more employees, staffing more reserve or standby flight attendants, staffing more "overage" ground employees, offering more premium, incentive, or overtime pay).[6]  This significant impact to the Airlines' mitigation strategies and how they provide their services is in and of itself an impermissible impact caused by the Michigan Law, and has had and/or will have a significant impact on the Airlines' prices, routes, and/or services.

82.     Notably, two district courts have already held that paid sick leave laws, with provisions similar to the Michigan Law's provisions, are preempted by the ADA.  In *Delta Air Lines, Inc. v. New York City Department of Consumer Affairs*, 564 F. Supp. 3d 109, 124

---

[6]     Additionally, the Michigan Law has been and/or will be administratively burdensome and costly for the Airlines, including because tracking the hours that flight crew work in Michigan is difficult due to the transitory nature of their work.

25

(E.D.N.Y. 2021), the Eastern District of New York held that compliance with New York City's paid sick time law—which has similar paid sick leave provisions as the Michigan Law—would have a potential impact on "the availability of flight attendants, and thus on-time flights, a core service of the airline," and thus was preempted by the ADA.

83.     Likewise, in *Air Transport Association of America, Inc. v. Campbell*, No. 18-CV-10651-ADB, 2023 WL 3773743, at \*12 (D. Mass. June 2, 2023), the District of Massachusetts held that Massachusetts' paid sick leave law—which also has similar paid sick leave provisions as the Michigan Law—was preempted by the ADA because it "caus[ed] an increase in employees calling out sick," and had "a clear and direct impact, which is not tenuous, remote or peripheral, on the availability of the Airlines' labor force and therefore their ability to provide . . . services to customers."

84.     For at least the reasons discussed herein, the Michigan Law has had and/or will have a significant impact on the Airlines' prices, routes and/or services, and thus is preempted by the ADA.

## COUNT I

## THE AIRLINE DEREGULATION ACT PREEMPTS THE MICHIGAN LAW

85.     A4A re-alleges and incorporates herein each of the preceding allegations.

86.     The Supremacy Clause, Article VI, Clause 2, of the United States Constitution states: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2.

87.     Under the Supremacy Clause, federal law preempts any state or local regulation in an area in which Congress has expressly or impliedly exercised exclusive authority.

88.     Congress enacted the ADA in 1978 to deregulate the airline industry; to ensure maximum reliance on competitive market forces; to encourage efficiency, innovation, and lower

26

prices; and, to meet the needs of consumers and the commerce of the United States.  To prevent states and municipalities from undoing federal deregulation of air transportation with regulation of their own, Congress enacted a broad express preemption provision.  The ADA expressly and broadly prohibits state and local governments from enacting or enforcing "a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier."  49 U.S.C. § 41713(b)(1).

89.    The U.S. Supreme Court has held that § 41713(b)(1) is "deliberately expansive." *Morales*, 504 U.S. at 384 (citation omitted).  The ADA broadly preempts all state laws that have a "significant impact" on airline prices, routes, or services—even if the state law is "not specifically designed to affect" airlines, and even if its "effect is only indirect," as long as it is not "too tenuous, remote, or peripheral."  *Id.* at 386, 390 (citations omitted).

90.    The Michigan Law has had and/or will have a "significant impact" on the Airlines' prices, routes, and/or services, and is therefore preempted by the ADA.

91.    *First*, the Michigan Law has caused and/or will cause an increase in employee absences from both use and abuse of earned sick time, which in turn has had and/or will have a significant impact on the Airlines' prices, routes, and/or services.  For example, such increased absences have caused and/or will cause a significant impact on numerous Airline services, including:  (i) on-time boardings; (ii) on-time departures; (iii) services at the ticket counter, at the gates, in premium service clubs, and in baggage service offices; (iv) baggage loading and unloading, aircraft towing, de-icing, cargo services, aircraft taxiing, and deplaning; and (v) aircraft maintenance services.

92.    *Second*, these increased absences have caused and/or will cause the Airlines to change their services (*e.g.*, by reducing or altering the services provided to passengers, as

27

discussed *supra*, to compensate for increased employee absences) and how they provide their services, including by potentially forcing them to employ or change mitigation strategies (*e.g.*, hiring additional employees, reworking reserve and overtime programs) to protect their operations.  This impact to the Airlines' services and how they provide those services has caused and/or will cause a significant impact on the Airlines' prices, routes, and/or services.

93.    Because the Michigan Law impermissibly relates to the Airlines' "prices, routes, or services," the ADA preempts the Michigan Law in its entirety.  As a result, the Michigan Law violates the Supremacy Clause of the United States Constitution.  Accordingly, A4A is entitled to a judgment declaring that the Airlines are not subject to the Michigan Law and an injunction against enforcement thereof.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff A4A asks for the following relief:

(a)    Judgment against Defendant declaring that the Michigan Law, as applied to the Airlines, is preempted by the Airline Deregulation Act, and is therefore unenforceable by virtue of the Supremacy Clause of the United States Constitution.

(b)    Permanent injunctive relief prohibiting enforcement of the Michigan Law against the Airlines.

(c)    An award to A4A for its attorneys' fees and costs incurred in this action under any applicable law.

(d)    Any other relief the Court may deem just and appropriate.

Dated:  December 31, 2025

Respectfully submitted,

/s/ *Alisha Q. Nanda*
James R. Carroll
Alisha Q. Nanda
Emily M. Jennings
Christopher Corcoran
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
500 Boylston Street
Boston, Massachusetts 02116
Telephone: (617) 573-4800
james.carroll@skadden.com
alisha.nanda@skadden.com
emily.jennings@skadden.com
christopher.corcoran@skadden.com

/s/ *Stephanie A. Douglas*
Stephanie A. Douglas
Roger P. Meyers
Nicole K. Haelterman
BUSH SEYFERTH PLLC
100 West Big Beaver Road, Suite 400
Troy, MI  48084
Telephone:  (248) 822-7800
douglas@bsplaw.com
meyers@bsplaw.com
haelterman@bsplaw.com

*Counsel for Plaintiff*
*Air Transport Association of America, Inc.*
*d/b/a Airlines for America*