# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **AIR TRANSPORT ASSOCIATION OF AMERICA, INC. d/b/a AIRLINES FOR AMERICA,** | ) ) ) ) | |
| **Plaintiff,** | ) | **No. 24-cv-4623** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **KENNETH J. MEYER, in his official capacity as Commissioner of the Department of Business Affairs and Consumer Protection,** | ) ) ) ) | **Judge Jeffrey I. Cummings** |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Air Transport Association of America, Inc. d/b/a Airlines for America (the "Association") brings this complaint ("Complaint") against Kenneth J. Meyer in his official capacity as Commissioner of the Department of Business Affairs and Consumer Protection, alleging that the Chicago Paid Leave and Paid Sick Leave Ordinance, Mun. Code of Chicago §§6-130-005, *et seq.*, and any rules promulgated thereunder, as applied to the Association's member carriers (the "Airlines"), are preempted by (1) the Airline Deregulation Act of 1978, 49 U.S.C. §§41701–26, ("ADA") and (2) the Railway Labor Act, 45 U.S.C. §§151–88, ("RLA"). (Dckt. #1). Before the Court is defendant's motion to dismiss plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dckt. #30). For the reasons that follow, defendant's motion to dismiss is denied.

## I.     LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell. Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility requires a plaintiff to "go beyond mere speculation or conjecture." *Wertymer v. Walmart, Inc.*, 142 F.4th 491, 495 (7th Cir. 2025). The complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A complaint that satisfies this standard is 'well-pled' and may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable." *Berk v. Choy*, 146 S.Ct. 546, 553 (2026) (cleaned up); *Orr v. Shicker*, 147 F.4th 734, 740 (7th Cir. 2025) (recognizing that the "notice-pleading standard is deliberately undemanding.") (cleaned up). As such, the Federal Rules require "no more than a statement of the claim" without the pleading of evidence to support it, *Berk*, 146 S. Ct. at 553.

When considering a motion to dismiss under Rule 12(b)(6), the Court "constru[es] the complaint in the light most favorable to the plaintiffs and accept[s] all well-pleaded factual allegations as true." *Horist v. Sudler & Co.*, 941 F.3d 274, 278 (7th Cir. 2019); *Esco v. City of Chicago*, 107 F.4th 673, 678 (7th Cir. 2024). Moreover, in opposing a Rule 12(b)(6) motion, a plaintiff is free to "elaborate on his factual allegations so long as the new elaborations are consistent with the pleadings." *Peterson v. Wexford Health Sources, Inc.*, 986 F.3d 746, 752 n.2 (7th Cir. 2021) (cleaned up). Dismissal is only warranted if "no relief could be granted under any set of facts that could be proved consistent with the allegations." *Christensen v. Cnty. of Boone*, 483 F.3d 454, 458 (7th Cir. 2007).

## II.    RELEVANT FACTS

### A.    The Airlines' Employment Terms

The Court draws the facts set forth below from plaintiff's Complaint.  (Dckt. #1).

The Association is a nonprofit corporation that advocates on behalf of ten federally regulated air carriers and three cargo carriers who collectively account for more than 90% of the annual passenger and cargo traffic on U.S. airlines.  (*Id.* ¶7).  The Association represents Airlines that employ more than 90% of the pilots, flight attendants, ground crew members, and other employees who operate flights around the country and the world.  (*Id.* ¶¶7, 16, 22).  Flight crew—pilots and flight attendants—are highly mobile workers: they often work out of bases different from the cities where they live, are permitted to transfer between bases from month to month, and spend much of their work time in federally regulated airspace.  (*Id.* ¶¶16–18).  Ground crew are less mobile, and typically live near the airport where they work.  (*Id.* ¶22).  They perform services for ticketing, boarding, seating, baggage, towing, de-icing, taxiing, deplaning, and technical maintenance, among other airport and aircraft needs.  (*Id.* ¶¶24–26).

The employment terms of Airlines' flight crew and ground crew are detailed in collective bargaining agreements ("CBAs") and company policies.  (*Id.* ¶28).  With respect to paid time off in particular, CBAs and company policies reflect the outcome of extensive negotiation and consideration to maintain a "delicate balance" between the needs of Airline employees to take paid time off and the needs of Airlines to have sufficient staffing for the round-the-clock transportation services they provide.  (*Id.* ¶29).  Existing policies "are designed to ensure uniformity, predictability, and fairness" for Airline employees in any given work group nationwide.  (*Id.* ¶31).  They describe detailed procedures for seniority-based schedule bidding, trip and shift trading, sick time, other time off, and attendance policies.  (*Id.* ¶¶31–48).  Airlines

enforce their attendance policies with two "accountability tools": (1) points systems where employees accrue points for each occurrence of sick leave or unplanned absence, and where those points can factor into discipline; and (2) the ability to request doctor's notes if the circumstances of an employee's sick call suggest potential abuse. (*Id.* ¶¶42–48).

The Association alleges that, although Airlines have "mitigation strategies" in place that can help provide coverage for employees who call out sick," (*id.* ¶84), "[m]ost of the Airlines' flights operate with the minimum staffing level for pilots and flight attendants," (*id.* ¶19), and existing strategies "cannot and do not insulate the Airlines from the service impacts attributable to employee absences," (*id.* ¶84).

### B. The Ordinance

The Chicago Paid Leave and Paid Sick Leave Ordinance (the "Ordinance"), which has been in effect since July 1, 2024, governs when and how covered employees—defined as any employee "who works at least 80 hours for an Employer within any 120-day period while physically present within the geographic boundaries of Chicago"—can earn, use, and carry over paid leave and paid sick leave. (*Id.* ¶¶49–73). It imposes requirements for the minimum amount of leave to which covered employees are entitled, (*id.* ¶¶57, 59); the reasons for which employees can use paid leave and paid sick leave, (*id.* ¶¶58, 60); and the notice and documentation that an employer can require an employee to provide, (*id.* ¶¶58, 61, 65).

The Ordinance prohibits the use of an "absence-control policy . . . to count paid time off as an absence that triggers discipline, discharge, demotion, suspension, or any other adverse activity." (*Id.* ¶66). It also prohibits employers from requiring employees to provide documentation of how their paid sick leave is used "until an employee is absent for more than three consecutive workdays." (*Id.* ¶65). If an employer does require such documentation, they

4

face a "rebuttable presumption that it has violated the Ordinance." (*Id.* (cleaned up)). The Ordinance allows CBAs entered into after July 1, 2024 to waive the Ordinance's leave rules, but "only if the waiver is set forth explicitly in such agreement in clear and unambiguous terms." (*Id.* ¶67).

The Association alleges that the Ordinance "will lead to more employee absences" and "cause an increase in late-scheduled or ill-timed use of paid leave." (*Id.* ¶¶72–73). An increase in employee absences and unplanned leave, it further alleges, will "disrupt[] the Airlines' passenger boarding procedures," (*id.* ¶75); "caus[e] or contribut[e] to flight delays and cancellations," including "downline delays," (*id.* ¶¶75–76); and "impact the operational reliability of a base, which in turn affects the viability of that base for an Airline," (*id.* ¶78). "The Ordinance will require the Airlines to incur even further costs for [their] mitigation strategies and/or to implement expensive changes to their business models." (*Id.* ¶84).

## III.     ANALYSIS

Plaintiff argues that the Ordinance is preempted by two federal statutes: the Airline Deregulation Act ("ADA") and the Railway Labor Act ("RLA"). Defendant contends that plaintiff fails to state a claim under either statute. For the reasons set forth below, the Court finds that plaintiff has properly alleged both ADA and RLA preemption claims, and denies defendant's motion to dismiss.

"Pre-emption may be either express or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *FMC Corp. v. Holliday*, 498 U.S. 52, 56–57 (1990) (cleaned up). The Court "begin[s] with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *FMC Corp.*, 498 U.S. at 57.

**A. The Association Has Plausibly Alleged That the Ordinance Is Subject to ADA Preemption.**

The ADA contains an express preemption provision that prohibits state and local governments from "enact[ing] or enforc[ing] a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier." 49 U.S.C. §41713(b)(1). A state law "relates to" a price, route, or service if it "[has] a connection with or reference to airline rates, routes, or services," even if the effect of a law is "only indirect," as long as the effect is not "too tenuous, remote, or peripheral." *Morales v. Trans World Airlines, Inc.*, 504. U.S. 374, 384, 386 (1992) (cleaned up). Courts have held that "pre-emption occurs at least where state laws have a 'significant impact'" on airline rates, routes, and services. *See Rowe v. New Hampshire Motors Transp. Ass'n*, 552 U.S. 364, 371 (2008), *quoting Morales*, 504 U.S. at 390. To evaluate such impact, courts "conduct an individualized inquiry that 'engages with the real *and logical* effects of the state statute.'" *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1055 (7th Cir. 2016) (cleaned up) (emphasis included).

Defendant argues that the Association has failed to sufficiently allege that the ADA preempts the Ordinance because: (1) plaintiff's arguments about the effect of the Ordinance are speculative; and (2) at most, the Ordinance impacts labor costs, which are too far removed from "fares, routes, or services" for the Ordinance to be preempted by the ADA. (Dckt. #34 at 14, 10). The Court disagrees.

To begin, defendant contends that the Ordinance will not *actually* increase employee absences because: (1) the chain of causation is "tenuous," (*id.* at 15); (2) the Airlines already have mitigation strategies in place to avoid disruptions, (*id.*); (3) Airline policies and CBA terms "largely track or exceed" the Ordinance's paid leave and paid sick leave provisions, (Dckt. #41 at

4 n.1); and (4) the Ordinance "does not change the terms of CBAs already in place on July 1, 2024," (*id.*).

Defendant's arguments mischaracterize the allegations in the Complaint, which go beyond mere speculation. In particular, the Association explicitly alleges that the Ordinance "*will* lead to more employee absences," "*will* . . . cause an increase in late-scheduled or ill-timed use of paid leave," and "*will* . . . cause[e] or contribut[e] to flight delays and cancellations;" and that existing mitigation strategies are insufficient to accommodate additional absences. (Dckt. #1 ¶¶72–73, 75, 84 (emphasis added)). Furthermore, the provisions within the existing CBAs and company policies that provide generous leave—which the Association alleges were "carefully negotiated over long periods of time," (*id.* ¶4)—do not contradict the fact that the Ordinance mandates that the Airlines provide greater flexibility on terms that were *not* reached via negotiation (such as the reasons that employees can take paid leave and the Airlines' inability to enforce their accountability policies). (Dckt. #37 at 13 n.4).

The Court "constru[es] the complaint in the light most favorable to the plaintiffs," *Horist*, 941 F.3d at 278, and as the Association correctly points out, the Court considers both the real and the logical effects of a law when considering ADA preemption, *see Costello*, 810 F.3d at 1055. Based on the "delicate balance" of staffing logistics that the Association alleges, (Dckt. #1 ¶29), it is plausible beyond speculation that a law regulating leave policies will upset that balance—as early as July 1, 2024 for employers not bound by CBAs, and when "employees enter into a new CBA" for employers who currently have CBAs with unions, (Dckt. #41 at 4 n.1). Furthermore, the Association plausibly alleges that the increase in employee absences constitutes a "significant impact" on airline rates, routes, or services. Contrary to defendant's framing, the Association does not allege merely "a possible increase in . . . labor costs" and a "downstream impact on

7

customer-facing services." (Dckt. #34 at 15). Instead, it alleges that the Ordinance will disrupt flight services themselves, including by causing flight delays and cancellations, due to the difficulty and ripple effect of finding replacement members for a flight or ground crew. (Dckt. #1 at 72–84).

Finally, the Association persuasively analogizes the Ordinance to the New York and Massachusetts sick leave laws that other courts have found preempted by the ADA, as well as the Colorado and Minnesota sick leave laws against which the Association has brought preemption claims that have survived motions to dismiss. *See Delta Air Lines, Inc. v. New York City Dep't of Consumer Affairs*, 564 F.Supp.3d 109, 124 (E.D.N.Y. 2021) (finding that a New York sick leave law went "directly to the availability of flight attendants, and thus on-time flights, a core service of the airline."); *Air Transp. Ass'n of Am., Inc. v. Campbell*, No. 18-cv-10651-ADB, 2023 WL 3773743, at *12 (D.Mass. 2023) (finding that a Massachusetts sick leave law "caus[ed] an increase in employees calling out sick" and thus "has a clear and direct impact, which is not tenuous, remote or peripheral"); *see also Air Transp. Ass'n of Am., Inc. v. Moss*, No. 1:23-cv-02421-DDD-KAS, 2024 WL 4369137, at *4 (D.Colo. Sept. 30, 2024) (denying a motion to dismiss plaintiff's claim that the ADA preempted a Colorado sick leave law); *Air Transp. Ass'n of Am., Inc. v. Blissenbach*, No. 24-cv-4657 (JWB-ECW), Transcript of Proceedings (D.Minn. May 14, 2025) (Dckt. #60-1 at 15)[1] (denying a motion to dismiss plaintiff's claim that the ADA preempted a Minnesota sick leave law because "if there isn't staff, then the plane can't fly, and that would certainly seem to go to the heart of what the airline is all about.").[2] As such, the

---

[1] The Association submitted a copy of the *Blissenbach* order denying defendant's motion to dismiss and the transcript of the May 14, 2025 hearing on the motion to dismiss as supplemental authority and filed the order and transcript as Dckt. #60-1 in this case.

[2] Defendant's reliance on other cases where the preemption issue was addressed on summary judgment, (*See* Dckt. #34 at 16–17), is misplaced because the plaintiffs in those cases had the burden of presenting

Court finds that the Association has pled facts which support a plausible finding that the Ordinance will impose a "significant impact" not just on labor costs, but on flights—the core customer-facing service that the Airlines offer.

In sum: accepting the Association's factual allegations as true and viewing them in the light most favorable to the Association as the Court is required to do, the Court finds that the Association has stated a plausible claim that the ADA preempts the Ordinance.

### B. The Association Has Plausibly Alleged That the Ordinance Is Subject to RLA Preemption.

Unlike the ADA, the RLA does not contain an express preemption provision. Instead, the Association argues that the RLA preempts the Ordinance under two theories of implied preemption: *Machinists* preemption and "minor dispute" preemption. Defendant argues that neither theory succeeds. The Court disagrees and, finding that plaintiff has plausibly alleged *Machinists* preemption, declines to reach the question of whether plaintiff has plausibly alleged minor dispute preemption. *See Signal Funding, LLC v. Sugar Felsenthal Grais & Helsinger LLP*, 136 F.4th 718, 724 (7th Cir. 2025) ("Where a plaintiff states a plausible claim for relief under one discernable legal theory, we start and end there.") (cleaned up).

The *Machinists* preemption doctrine forbids the regulation of conduct that Congress intended "be unregulated [and] left to be controlled by the free play of economic forces." *Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Wis. Emp't Rel's Comm'n*, 427

---

evidence (and not merely allegations) to support their claims and the courts had the benefit of a full factual record. *See Bennett v. Schmidt*, 153 F.3d 516, 518–19 (7th Cir. 1998) (contrasting the standard for resolving a motion to dismiss with the standard on summary judgment). And while defendant cites authority from the Seventh Circuit that laws regulating "labor inputs"—including minimum wage laws, worker-safety laws, and anti-discrimination laws—are not preempted by the ADA, *see S.C. Johnson & Son, Inc. v. Transp. Corp. of Am., Inc.*, 697 F.3d 544, 558 (7th Cir. 2012), the Association persuasively distinguishes the state bribery and racketeering claims that were found not preempted there, as well as the wrongful discharge claims that were found not preempted in *Watson v. Air Methods Corp.*, 870 F.3d 812, 814–15 (8th Cir. 2017), from the sick leave law at issue in the Ordinance, (*see* Dckt. #37 at 19 n.10).

U.S. 132, 140 (1976) (cleaned up) (*Machinists*).[3]  It is based on the idea that "Congress struck a balance of protection, prohibition, and laissez-faire in respect to union organization, collective bargaining, and labor disputes."  *Machinists*, 427 U.S. at 140.  Nonetheless, federal law does not preempt a state law that "establishes a minimum labor standard that does not intrude upon the collective-bargaining process."  *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 7 (1987).  A minimum labor standard is one that, at a minimum," affect[s] union and nonunion employees equally, and neither encourage[s] nor discourage[s] the collective-bargaining processes that are the subject of the [National Labor Relations Act ("NLRA")]."  *Metro Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 755 (1985).  Minimum labor standards "have only the most indirect effect on the right of self-organization established in the Act."  *520 S. Michigan Ave. Assocs., Ltd. v. Shannon*, 549 F.3d 1119, 1129 (7th Cir. 2008) (cleaned up).  "[S]tate action that intrudes on the mechanics of collective bargaining is preempted, but state action that sets the stage for such bargaining is not."  *American Hotel and Lodging Ass'n v. City of Los Angeles*, 834 F.3d 958, 964 (9th Cir. 2016).  What a state cannot do directly, it also cannot do indirectly, *Chamber of Com. of U.S. v. Brown*, 554 U.S. 60, 69 (2008), so even regulations that indirectly interfere with collective bargaining can be preempted under *Machinists*.

The Association alleges that the Ordinance is not a "minimum labor standard" for four reasons: (1) it is not a law of general application; (2) it creates a disincentive to collective bargaining; (3) it contains a formidable enforcement mechanism; and (4) it interferes with "every aspect of the Airlines' sick leave, personal leave, and vacation policies."  (Dckt. #37 at 22–23).  The Association further alleges that the Ordinance affects union and nonunion employees

---

[3] "Where RLA and NRLA provisions 'are in all material respects identical,' the Supreme Court has used RLA cases as a guide to the NLRA and vice versa."  *Int'l Ass'n of Machinists Dist. Ten and Local Lodge 873 v. Allen*, 904 F.d 490, 501 n.5 (7th Cir. 2018), *quoting Commc'ns Workers of Am. v. Beck*, 487 U.S. 735, 745 (1988).

unequally and discourages the collective bargaining process. (*Id.* at 23–24). For the reasons below, the Court finds that plaintiff's allegations state a plausible claim for preemption under the RLA.

### 1. The Association Has Plausibly Alleged That the Ordinance Is Not a Law of General Application.

The Association argues that the Ordinance is not a law of general application because it categorically excludes several groups of employees, including workers in the "construction industry" (broadly defined to include snow plowing, snow removal, and refuse collection); federal employees; state employees; "essentially any employee of a railroad"; and any employee covered by a CBA that explicitly waives the Ordinance's provisions. (Dckt. ##1 ¶108; 37 at 22). Defendant disagrees, arguing that the Ordinance "has a broader reach than many laws . . . that have survived preemption challenges," (Dckt. #41 at 11). In support of its argument, defendant contrasts the Ordinance with the Hotel Room Attendant Amendment ("Attendant Amendment") at issue in *Shannon*, which the Seventh Circuit found was preempted by the NLRA in part because it applied "to only one occupation (room attendants), in one industry (the hotel industry), in one county (Cook county)." 549 F.3d at 1130. Defendant argues that unlike the "hyper-specific" and "too narrow" regulation at issue in *Shannon*, the Ordinance here is more like the Chicago Fair Workweek Ordinance at issue in *Building Owners and Managers Association of Chicago v. City of Chicago*, which the court found was *not* preempted by the NLRA. (Dckt. #34 at 21); *see* 513 F.Supp.3d 1017, 1026 (N.D.Ill. 2021) (*BOMA*).

As an initial matter, defendant's analogies to these other cases are not persuasive. Either they were decided on summary judgment and not on a motion to dismiss, where plaintiff must only state a claim that is "plausible on its face," *Twombly*, 550 U.S. at 570, or they concern distinguishable factual scenarios. (*See* Dckt. #34 at 22). In particular, neither *Shannon* nor

11

*BOMA* makes it implausible that the Ordinance (unlike the Attendant Amendment) is *not* a law of general application, given that the Association has alleged that numerous classes of employees are exempt from the Ordinance. Moreover, *BOMA* is distinguishable because unlike the industries affected in that case, the Airlines belong to an industry uniquely susceptible to "predictive-scheduling issues." (Dckt. #37 at 25); *cf. BOMA*, 513 F.Supp.3d at 1024 (finding that the law at issue was not a law of general application in part because "BOMA does not allege or argue that the industries it identifies suffer from late scheduling changes"). Thus, the Association has plausibly alleged that the Ordinance is not a law of general application.

### 2. The Association Has Plausibly Alleged That the Ordinance Creates a Disincentive to Collective Bargaining.

Next, the Association argues that the Ordinance creates a "disincentive to collective bargaining" by establishing "terms of employment [through legislation] that would be very difficult for any union to bargain for." (Dckt. #37 at 22, 24) (cleaned up). This argument, too, is plausible. Although defendant correctly points out that "the NLRA is concerned with ensuring an equitable bargaining process, not with the substantive terms that may emerge from such bargaining," *Fort Halifax*, 482 U.S. at 20, the Association emphasizes the "delicate balance" that the Airlines have struck in their CBAs, (Dckt. #1 ¶29), and like the plaintiffs in *Shannon*, it has plausibly alleged that the Ordinance constitutes "more than a mere backdrop" to the Airlines' negotiations. *Shannon*, 549 F.3d at 1134. Indeed, the Ordinance allegedly disrupts the Airlines' negotiations altogether by overriding "long-standing features" of Airlines' CBAs—namely, points-based attendance systems and the use of doctors' notes—that "unions have been unable to get the Airlines to abandon through the collective bargaining process." (Dckt. #1 ¶107(a)). Furthermore, like the Minnesota law at issue in *Blissenbach*, the Ordinance imposes the same requirements on *all* paid leave and paid sick leave that Airlines might provide their employees,

12

effectively relying on—and interfering with—previously bargained-for terms governing paid leave. (*See* Dckt. 60-1 at 38-39 (denying a motion to dismiss plaintiff's claim that the RLA preempted a Minnesota sick leave law)). In an industry where even small staff shortages have cascading effects on the services employers provide, (*see id.*; Dckt. #1 ¶¶72–84), it is plausible that the features affected by the Ordinance are so substantive as to "discourage the collective-bargaining processes that are the subject of the [RLA]," *Metro. Life*, 471 U.S. at 755, "encourag[ing] . . . employers or unions to focus on lobbying at the state capital instead of negotiating at the bargaining table," *Shannon*, 549 F.3d at 1132–33.

### 3. The Association Has Plausibly Alleged That the Ordinance Contains a Formidable Enforcement Mechanism.

The Association goes on to compare enforcement provisions in the Ordinance to parallel provisions in the Attendant Amendment at issue in *Shannon*, which the Seventh Circuit found to be "formidable enforcement mechanism[s]," including: (1) the ability for employees to recover treble damages plus interest, attorney's fees, and costs, and (2) the creation of a "rebuttable presumption" that a covered employer has violated the Ordinance if it requires documentation before receiving notice that an employee has taken paid sick leave for three consecutive days. (Dckt. #37 at 22). Although defendant argues that the Ordinance's enforcement measures are narrower than those at issue in *Shannon*, and that the Ordinance is therefore still a minimum labor standard, (Dckt. #41 at 14), the Court finds that the Association has plausibly alleged that the Ordinance's enforcement provisions—like those in *Shannon* and unlike those in *BOMA*—"can in no sense be considered 'minimal.'" (Dckt. #1 ¶107(b)); *Shannon*, 549 F.3d at 1135).

As an initial matter, the Court is not convinced that the Attendant Amendment was, as defendant argues, more severe. That law established a rebuttable presumption only where an employee plausibly alleged retaliation based on a statutory violation, while the Ordinance creates

13

a rebuttable presumption as soon as an employer requires a doctor's note before sufficient time has passed. *See Shannon*, 549 F.3d at 1135 n.12; (Dckt. #1 ¶65). Moreover, the Association has plausibly alleged that the Ordinance's enforcement mechanisms surpass those of a "minimum labor standard," especially given the treble damages and burden of proof that the courts in both *Shannon* and *BOMA* recognized as surpassing provisions of a "minimum labor standard." *Shannon*, 549 F.3d at 1135; *BOMA*, 513 F.Supp.3d at 1025.

### 4. The Association Has Plausibly Alleged That the Ordinance Affects the Structure of the Entirety of the Employment Agreement.

Fourth and finally, the Association adequately alleges that the Ordinance cannot constitute a minimum labor standard because it affects "the structure of the entirety of the employment agreement." *Shannon*, 549 F.3d at 1137. In particular, the Association argues that the Ordinance "imposes a pervasive scheme of regulation with respect to numerous aspects of the working relationship between Airlines and their employees, in derogation" of CBAs. (Dckt. #1 ¶104(a)). Defendant contends that the Ordinance only establishes minimum labor standards, and that "the alleged interference is not with the *process* of collective bargaining." (Dckt. #41 at 14–15). But as explained above, a law can surpass a "minimum labor standard" by establishing employment terms that cannot be reached by negotiation, *see Shannon*, 549 F.3d at 1134; *Blissenbach*, No. 24-cv-4657 (JWB-ECW), Order (D.Minn. May 14, 2025), and even indirect regulations of collective bargaining can be preempted, *Brown*, 554 U.S. at 69.

The Court finds two aspects of the Complaint are particularly relevant. First, the Association has alleged that the impact of the Ordinance on "every aspect of the Airlines' sick leave, personal leave, and vacation policies" goes beyond the "minimal substantive impact on contracts" that the Seventh Circuit and its sister circuits have found to constitute a minimum labor standard. *See Shannon*, 549 F.3d at 1134, *Chamber of Com. of U.S. v. Bragdon*, 64 F.3d

14

497, 600 (9th Cir. 1995); *Hull v. Dutton*, 935 F.2d 1194, 11987 (11th Cir. 1991). Rather than impacting only paid leave and paid sick leave, the Ordinance (as the allegations of the Complaint set forth) affects all facets of Airlines' scheduling practices, and thus their services. (*See* Dckt. #60-1 at 38-39).

Second, the Association has plausibly alleged that the Ordinance does not only affect "employees as individual workers, [but] as members of a collective organization." *Metro. Life*, 471 U.S. at 755 (cleaned up); (*see* Dckt. #1 ¶¶32, 75–83). When one flight attendant calls in sick on short notice, for example, their unavailability plausibly affects the operation of an entire flight crew and flight, not to mention every subsequent connecting flight and the flights of any other employees who need to be rerouted as replacements. Because the Association adequately alleges the Ordinance's pervasive effects on (1) "every aspect" of Airlines' scheduling practices and (2) the rights of employees as a collective organization, rather than as individuals, the Court finds it plausible that the Ordinance exceeds a "minimum labor standard."

### 5. The Association Has Plausibly Alleged That the Ordinance Affects Union and Nonunion Employees Unequally.

The parties disagree about whether the Ordinance affects union and nonunion employees unequally, but here, too, the Association's argument is sufficiently persuasive to survive defendant's motion to dismiss. Specifically, it argues that the Ordinance mandates earlier compliance for some non-union employers and creates the possibility of waiver for union employees, but not for non-union employees. (Dckt. #37 at 23). Defendant contends that "the baseline of the Ordinance is that it applies to both groups of employees," and besides, that "the focus of the preemption analysis is not whether a law subjects all employees to identical requirements." (Dckt. #41 at 15 & n.7). While the Court agrees that the preemption analysis is

broader than the question of equal treatment alone, it finds that the Association has plausibly alleged that the Ordinance treats union and nonunion employees unequally.

### 6. The Association Has Plausibly Alleged That the Ordinance's Opt-Out Provision Disincentives Collective Bargaining.

Lastly, the Association argues that the Ordinance alters the collective bargaining process because its opt-out provision "delegat[es] to unions the unfettered authority to determine whether Airlines must comply with the requirements of the Ordinance." (Dckt. #1 ¶4). They argue that the provision is merely "illusory" because unions have historically not waived state or local regulations in their CBAs, or likely will not. (*See* Dckt. ##37 at 24). Defendant contends, citing several cases out of the Ninth Circuit, that states are well within their rights to pass "familiar and narrowly-drawn opt-out provisions" that accompany minimum labor standard laws. (*See* Dckt. #34 at 20–21). The Supreme Court has stated, when considering similar opt-out laws in the context of the NLRA, that the NLRA "should cast no shadow on the validity of these familiar and narrowly drawn opt-out provisions." *Livadas v. Bradshaw*, 512 U.S. 107, 132 & n.6 (1994). Even so, the Court finds it "plausible," even if arguably "improbable," *Berk*, 146 S. Ct. at 553, that the Ordinance's opt-out provision disincentivizes bargaining, at least in the particular context of the Airlines' "detail[ed]" CBA negotiations, (Dckt. #1 ¶41), given the "delicate balance" of logistics at play and unions' alleged longstanding inability to effectuate different paid leave and paid sick leave provisions in their CBAs, (*id.* ¶¶29, 107(a)). (*See* Dckt. #60-1 at 35, 41 (discussing how a Minnesota leave law "attaches and . . . grafts on to . . . provisions and responsibilities that were never negotiated" and permitting discovery about how the law at issue "interacts with, modifies, or contradicts federally governed airline labor relations under the RLA," as well as "whether the law was intended to or has in practice affected airline operations in a matter distinct from other industries")).

16

In sum: accepting the Association's factual allegations as true and viewing them in the light most favorable to the Alliance, the Court finds that plaintiff has stated a plausible claim that the RLA preempts the Ordinance.

## CONCLUSION

For the reasons set forth above, the Court denies defendant's motion to dismiss. (Dckt. #30). Defendant is ordered to answer by April 10, 2026. The partial stay on discovery is lifted. By April 17, 2026, the parties shall file a joint status report setting forth a proposed schedule for the completion of fact and expert discovery and providing an update on the status of their settlement negotiations.

**DATE:**      **March 20, 2026**

**Jeffrey I. Cummings**
**United States District Court Judge**