UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AIR TRANSPORT ASSOCIATION OF
AMERICA, INC. d/b/a AIRLINES FOR
AMERICA,

       Plaintiff,

v.

SUSAN CORBIN,

       Defendant.

_____/

Case No. 1:25-cv-1945

HON. JANE M. BECKERING

## OPINION AND ORDER

Plaintiff Air Transport Association of America, Inc. d/b/a Airlines for America ("A4A") alleges that Michigan's Earned Sick Time Act (ESTA) cannot be applied to A4A's members because the Airline Deregulation Act (ADA) preempts it.  Now pending before the Court is Defendant Susan Corbin's Motion to Dismiss (ECF No. 8).  For the following reasons, the Court determines that the Motion to Dismiss is properly denied.

### I.  BACKGROUND

### A.  Plaintiff's Factual Allegations

A4A is a nonprofit corporation organized under the laws of the District of Columbia, with its principal place of business in Washington, D.C. (Compl. [ECF No. 1] ¶ 6).  A4A advocates on behalf of nine federally regulated air carriers, which include six passenger carriers:  Alaska Airlines, Inc. ("Alaska"), American Airlines, Inc. ("American"), Delta Air Lines, Inc. ("Delta"), JetBlue Airways Corp. ("JetBlue"), Southwest Airlines Co. ("Southwest"), and United Airlines, Inc. ("United"); and three cargo carriers:  Atlas Air, Inc. ("Atlas"), FedEx Express ("FedEx"), and

UPS Airlines ("UPS") (collectively, "the Airlines") (*id.*). A4A alleges that as of October 2025, U.S. airlines employed over one million workers across the globe, including more than 748,000 full-time equivalent workers and 282,000 part-time workers (*id.*). Commercial aviation supports 5 percent of U.S. gross domestic product and more than 10 million U.S. jobs, including more than 56,000 jobs in Michigan (*id.*). Commercial aviation also contributes $6 billion annually to Michigan's gross state product (*id.*).

A4A indicates that, among other topics, A4A advocates for the Airlines on issues of safety, security, customer service, environment, energy, taxes, and economic growth (*id.* ¶ 7). A4A also works with the Airlines in legal, political, and regulatory arenas to foster a business and regulatory environment which promotes a safe, secure, and financially stable airline industry in the United States (*id.*). The Airlines are federally regulated air carriers, and many operate domestic and/or international flights daily into and out of airports in Michigan, including the Detroit Metro Wayne County and Grand Rapids airports (*id.* ¶ 8).

The Airlines' flight crew (i.e., its pilots and flight attendants) are not necessarily based in the same city or even the same state where they live, and it is common for flight crew based in one state to live in another state or even outside of the United States (*id.* ¶¶ 15–16). Flight attendants and pilots who are based in cities where they do not live are known as "commuters" (*id.*). Commuters who do not live within driving distance of their base are allowed to fly for free on their own Airline, and sometimes on other Airlines as well, between their place of residence and their base (*id.*). Because the vast majority of the flights operated by the Airlines in Michigan either begin or end in Michigan, but not both, flight crew based in Michigan do not spend all of their time working in Michigan (*id.* ¶ 17). These employees spend much of their work time in federally regulated airspace, and they often pass through multiple airports and states in the course of a single

day, spending time on the ground in each location to prepare for their next flight or begin a layover at a local hotel until the day of their next flight (*id.*).  Each Airline also employs thousands of ground crew members across the country, often with several hundred or more working at the airports where each Airline has its largest operations (*id.* ¶ 21). Several of the Airlines have significant complements of ground crew employees in Michigan (*id.*).   Ground crew employees often live near the airport where they work (*id.* ¶¶ 21–27).

*The CBAs.*  The employment terms of the Airlines' flight and ground crews are set forth in detailed collective bargaining agreements (CBAs) and/or company policies (*id.* ¶ 28).  The Airlines operating in Michigan have CBAs in place for at least some of their employees who work in Michigan (*id.* ¶ 29).  For example, Delta has a CBA with its pilots based in Michigan and this CBA also is nationwide in scope, and American and Southwest each have CBAs with their ground crew in Michigan and these CBAs are nationwide in scope (*id.*).  These CBAs are extensively negotiated by the union representing a specific group of employees (e.g., pilots) on one side, and the employer-Airline on the other side (*id.*).  Paid sick leave and other paid time off has long been the subject of extensive collective bargaining (*id.*). According to A4A, the negotiations and the related Airline policies/practices reflect a "delicate balance between the needs of Airline employees to have paid time away from work and the needs of Airlines to have adequate staffing to provide transportation services 24 hours a day, seven days a week, 365 days a year (including, for example, on holidays)" (*id.*).  Once a union and Airline tentatively reach agreement on a CBA—including, but not limited to, provisions relating to paid sick leave and other paid time off—the union generally submits the proposed CBA to the employees for a membership ratification vote (*id.*).  Once ratified, the CBA and the negotiated terms, rules, and conditions go into effect for the covered work group(s) (*id.*).

Unlike its pilots, Delta's flight attendants and ground crew employees are not represented by unions (*id.* ¶ 30). As a result, the employment terms for these employees are generally determined by nationwide Delta policies rather than CBAs (*id.*). The purpose of the CBAs and company policies is to create a uniform set of work rules that will apply to all employees in a given work group (e.g., flight attendants) on a nationwide basis, regardless of where the employees live or work. In this way, the CBAs and company policies are designed to ensure uniformity, predictability, and fairness across the Airlines' networks in a number of important areas, including (i) scheduling, (ii) trip and shift trading, (iii) vacation, (iv) other time off, and (v) sick time (*id.* ¶¶ 31–45).

*The ESTA.* In September 2018, the Michigan Legislature adopted the Earned Sick Time Act (ESTA), MICH. COMP. LAWS §§ 408.961–74, as a ballot initiative (*id.* ¶ 46). In November 2018, during the same legislative session, the Michigan Legislature voted to amend the ESTA (*id.* ¶ 47). However, on or about July 31, 2024, the Michigan Supreme Court held that amending ESTA during the same legislative session in which it was adopted was unconstitutional and ordered the ESTA to be reinstated in its original form (*id.* ¶ 48, citing *Mothering Just. v. Att'y Gen.*, 10 N.W.3d 845 (Mich. 2024)). On or about February 20, 2025, the Michigan Legislature passed amendments to the ESTA, which, by court order, were set to take effect on February 21, 2025 (*id.* ¶ 49). Michigan Governor Gretchen Whitmer signed the amendments into law on February 21, 2025 (*id.*).

The ESTA imposes a comprehensive paid sick leave benefit scheme on employers with employees in Michigan, including the Airlines (*id.* ¶ 50). The ESTA applies to nearly all employers in Michigan, including the Airlines that A4A represents. *See* MICH. COMP. LAWS § 408.962(g) (defining "employer"). The ESTA ensures that, at a minimum, employees earn 1

hour of paid sick leave for every 30 hours worked, and the ESTA assumes that airline flight crew employees will have worked not less than 40 hours in each workweek or 30 hours if employed by a small business. MICH. COMP. LAWS § 408.963(11)(b) (citing 29 C.F.R. § 925.801). Employees may use up to 72 hours of leave per year, but employers may set higher limits. *Id.* § 408.963(3). Employees may carry over up to 72 hours of unused leave per year. *Id.* § 408.963(5).

Employees are allowed to use accrued leave for many purposes involving the employee and their family members, such as mental or physical illness, injury, health condition, medical care, and needs resulting from sexual assault or domestic violence. MICH. COMP. LAWS § 408.964(1)(a)–(c). "Family member" broadly encompasses individuals related by blood or by law, as well as those individuals "whose close association with the employee is the equivalent of a family relationship." MICH. COMP. LAWS § 408.962(h)(*i*)–(*viii*). Employers may not require more than seven days' notice if leave is foreseeable, and employers may require notice "as soon as practicable" for unforeseeable leave. MICH. COMP. LAWS § 408.964(2), (3)(a). For earned sick time of more than three consecutive days, employers may require reasonable documentation. *Id.* § 408.964(6). An employer's "absence control policy" must not treat earned sick time taken under the ESTA as an absence that may lead to or result in retaliatory personnel action. MICH. COMP. LAWS § 408.966(3).

Last, the ESTA does not permit CBAs to waive its requirements. If an employee is covered by a CBA that was in effect when the ESTA came into effect and that conflicts with ESTA, then ESTA will apply "beginning on the stated expiration date in the [CBA], notwithstanding any statement in the agreement that it continues in force until a future date or event or the execution of a new [CBA]." MICH. COMP. LAWS § 408.972(1)–(2). The Wage and Hour Division of the

5

Department of Labor and Economic Opportunity (LEO) is responsible for administering and enforcing the ESTA. MICH. COMP. LAWS § 408.967(2).

### B. Procedural Posture

On December 31, 2025, A4A initiated this case against Susan Corbin in her official capacity as Director of LEO, seeking (1) a declaration that Michigan's Earned Sick Time Act (ESTA), MICH. COMP. LAWS §§ 408.961–74, is preempted by federal law; and (2) a permanent injunction prohibiting enforcement of the ESTA against the Airlines. On January 28, 2026, Director Corbin filed this Motion to Dismiss (ECF No. 8). A4A filed a response in opposition (ECF No. 9), and Director Corbin filed a reply (ECF No. 10). On March 24, 2026, A4A filed a supplemental authority (ECF No. 11), to which Director Corbin filed a response on April 24, 2026 (ECF No. 12). Having considered the parties' submissions, the Court concludes that oral argument is unnecessary to resolve the issues presented. *See* W.D. Mich. LCivR 7.2(d).

### II. ANALYSIS

### A. Motion Standard

Under Federal Rule of Civil Procedure Rule 8(a), a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a). Rule 12(b)(6) authorizes the court to dismiss a claim for relief in any pleading if it "fail[s] to state a claim upon which relief can be granted[.]" FED. R. CIV. P. 12(b)(6). To survive a motion to dismiss, a complaint must present "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Although the plausibility standard is not equivalent to a "'probability requirement,'

… it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679 (quoting FED. R. CIV. P. 8(a)(2)).

In deciding a motion to dismiss for failure to state a claim, the court must construe the complaint in the light most favorable to the non-movant and accept all well-pleaded factual allegations in the complaint as true. *Thompson v. Bank of Am., N.A.*, 773 F.3d 741, 750 (6th Cir. 2014). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

### B. Discussion

A4A seeks a judgment against Director Corbin declaring that the ESTA, as applied to the Airlines, is preempted by the Airline Deregulation Act (ADA), and is therefore unenforceable by virtue of the Supremacy Clause of the United States Constitution (ECF No. 1 at PageID.23). Director Corbin argues that dismissal of A4A's request of declaratory relief is warranted where the ESTA does not significantly impact airline prices, routes, or market entry, nor does it indirectly affect these aspects of air travel, and thus the ESTA is not preempted by the ADA (ECF No. 8 at PageID.50–51).[1] According to Director Corbin, U.S. Supreme Court case law establishes that the

---

[1] Defendant argues that this Court should also dismiss A4A's request for injunctive relief because A4A "fails to satisfy" the requirements for issuing such remedy in that A4A has not shown a strong likelihood of success on the merits and will not suffer irreparable harm absent an injunction, and issuing an injunction "deprives Michigan workers of the right to use benefits bestowed by the ESTA" (ECF No. 8 at PageID.60–63). In response, A4A argues that it has appropriately sought permanent injunctive relief and accurately points out that whether A4A is entitled to this remedy will be decided following a decision on the merits of its declaratory-judgment claim, not at the pleading stage (ECF No. 9 at PageID.94–95, citing *Banks v. United States*, 614 F.2d 95, 96 n.4 (6th Cir. 1980) ("Unless a case is decided on summary judgment, a permanent injunction must

7

ADA's preemptive application is broad, but not unlimited (*id.* at PageID.51–54).  Director Corbin also points out that the Ninth Circuit Court of Appeals has ruled that a state paid sick leave law is not preempted by the ADA, and she argues that other recent district court case law improperly expands the preemptive application of the ADA (*id.* at PageID.54–57).  Director Corbin argues that the ESTA is not preempted because its connection to airline prices, routes, or services is remote or tenuous at best (ECF No. 8 at PageID.58–60; ECF No. 10 at PageID.104–107).  Director Corbin concludes that discovery will not save A4A's claim (ECF No. 10 at PageID.107).

In response, A4A argues that it has plausibly pleaded its preemption claim where it alleges that (1) the ESTA undermines the Airlines' carefully crafted CBAs and company policies, which strike a balance between employee needs and the complexities of operating a 24-hours-a-day, 7 days-a-week nationwide network of domestic and international flights; and (2) increased employee absences have had and/or will have a significant impact on the Airlines' prices, routes, or services (ECF No. 9 at PageID.74–76, 82–84, 91–94).  A4A argues that Director Corbin relies on the Ninth Circuit decision to the exclusion of binding ADA precedent from the Supreme Court and the Sixth Circuit and that Director Corbin "downplays that all of the cases where A4A or an Airline challenged paid sick leave laws have proceeded to discovery (even the Ninth Circuit case cited by Defendant)" (*id.* at PageID.73, 79–82, 85–88).

Director Corbin's argument does not entitle it to dismissal of A4A's Complaint.

---

await a trial on the merits."); *Wedgewood Ltd. P'ship I v. Twp. Of Liberty, Ohio*, 610 F.3d 340, 349 (6th Cir. 2010) (affirming permanent injunction and indicating that "[i]n the usual course, a district court should conduct an evidentiary hearing before issuing a permanent injunction," but may instead grant such an injunction without a hearing where it has ruled on summary judgment). Defendant did not return to the topic in its reply brief, and the Court likewise gives the topic no further treatment at this juncture.

"Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." *Churchill Downs Tech. Initiatives Co. v. Michigan Gaming Control Bd.*, 162 F.4th 631, 637 (6th Cir. 2025) (quoting *Arizona v. United States*, 567 U.S. 387, 398 (2012)). "So state and federal laws 'can be in conflict or at cross-purposes,' and when that happens, the Supremacy Clause 'provides a clear rule' that federal law wins out." *Id.* (quoting *Arizona*, 567 U.S. at 399). Congress thus "has the power to preempt state law." *Id.* *See* U.S. CONST. art. VI, cl. 2 ("[T]he Laws of the United States … shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.").

In 1978, Congress passed the Airline Deregulation Act (ADA), 49 U.S.C. § 301 et seq., which "largely deregulated domestic air transport," *American Airlines, Inc. v. Wolens*, 513 U.S. 219, 222 (1995), in an effort to promote "efficiency, innovation, and low prices . . . through maximum reliance on competitive market forces," *Northwest, Inc. v. Ginsberg*, 572 U.S. 273, 280 (2014). To "ensure that the States would not undo federal deregulation with regulation of their own," the ADA expressly preempts state laws "related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1). *Wolens*, 513 U.S. at 222–23.

In *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992), the Supreme Court determined that (1) "[s]tate enforcement actions having a connection with, or reference to," carrier "'rates, routes, or services are pre-empted," *id.* at 384; (2) such preemption may occur even if a state law's effect on rates, routes, or services "is only indirect," *id.* at 386; (3) regarding preemption, it makes no difference whether a state law is "consistent" or "inconsistent" with federal regulation, *id.* at 386–87; and (4) preemption occurs at least where state laws have a "significant impact" related to Congress' deregulatory and pre-emption-related objectives, *id.* at

9

390. *Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364, 370–71 (2008).  The *Morales* Court indicated that federal law might not preempt state laws that affect fares in only a "tenuous, remote, or peripheral ... manner," such as state laws forbidding gambling; however, the Court did not say where, or how, "it would be appropriate to draw the line," because the state law before it did not "present a borderline question." *Id.* at 371 (citing *Morales*, 504 U.S. at 390).

The *Morales* Court ultimately held that the ADA "pre-empts the States from prohibiting allegedly deceptive airline fare advertisements through enforcement of their general consumer protection statutes." *Morales*, 504 U.S. at 378.  Subsequently, in *Wolens*, 513 U.S. at 226, 230–33, the Supreme Court barred statutory claims relating to the airline's devaluation of reward miles, but not common law breach of contract claims.  And in *Northwest*, 572 U.S. at 284, the Supreme Court held that a breach of implied covenant claim, which sought to reinstate the plaintiff-airline's frequent flyer program, related to "rates, routes, or services" because it "clearly has such a connection."

Here, A4A alleges that the ESTA provisions undermine the Airlines' carefully crafted CBAs and company policies and the resulting increased absences among flight and ground crews have had and/or will have a significant impact on the Airlines' prices, routes, or services, including by causing longer waits at the ticket counters, gates, or baggage carousels, disrupting the Airlines' baggage services, or causing flight delays or cancellations (Compl. ¶¶ 65–81).  According to Director Corbin, A4A alleges only "speculative harms," which are at best "tenuously connected" to the ESTA (ECF No. 8 at PageID.59).

At this juncture in the litigation, the Court must construe the Complaint in the light most favorable to A4A and accept its well-pleaded factual allegations as true.  *See Thompson*, 773 F.3d at 750.  According to the Sixth Circuit, district courts have "struggled to determine when a claim's

10

connection to carrier services is sufficiently strong to merit preemption, and when it is not." *Cf.*

*Headstream Techs., LLC v. FedEx Corp.*, No. 22-1410, 2023 WL 1434054, at *2 (6th Cir. Feb. 1,

2023).  The Sixth Circuit opined that "the dividing line, insofar as it exists, has not been clearly

drawn." *Id.*  Important to this Court's assessment of the strength of A4A's allegations in this case

is the Sixth Circuit's confirmation in *Headstream* that the term "services" as used in the ADA's

preemption clause does not refer merely to an airline's transportation service but more broadly

encompasses the "bargained-for or anticipated provision of labor from one party to another." *Id.*

at *3 (6th Cir. Feb. 1, 2023) (citing favorably to *Hodges v. Delta Air Lines, Inc.*, 44 F.3d 334, 336

(5th Cir. 1995) (en banc) (holding that the ADA's reference to "services" includes "elements of

'the contractual arrangement between the airline and the user of the service,' including—in the

context of commercial airlines—'items such as ticketing, boarding procedures, provision of food

and drink, and baggage handling, in addition to the transportation itself'")).

Moreover, as A4A points out (ECF No. 9 at PageID.78–79), Supreme Court precedent

demonstrates that courts may look to the logical effects of a challenged statute to assess

preemption. *See Rowe*, 552 U.S. at 372–73 (determining, without empirical data, that the Federal

Aviation Administration and Authorization Act (FAAAA) preempted a state law that "will" lead

to significant impacts); *Morales*, 504 U.S. at 388 (determining "as an economic matter," without

empirical data, that false advertising regulation will have a "forbidden effect upon fares"). *See*

*also Ware v. Tow Pro Custom Towing & Hauling, Inc.*, 289 F. App'x 852, 855–56 (6th Cir. 2008)

(holding under *Morales* that a provision in the FAAAA preempted a passenger's common-law

claims regarding trucking company's notice of fees and sales, as the claims relate "on their face"

to prices and services).

Therefore, the Court concludes that A4A sufficiently alleges that the ESTA, as applied to the Airlines, is preempted by the ADA because the ESTA "relate[s] to" and has a "significant impact" on the Airlines' "price[s], route[s], or service[s]." 49 U.S.C. § 41713(b); *Morales*, 504 U.S. at 390.

This Court's conclusion is consistent with the post-discovery juncture at which many other courts have resolved challenges to their respective paid sick leave laws. *See Air Transp. Ass'n of America, Inc. v. Washington Dep't. of Labor and Indus.*, 859 F. App'x 181 (9th Cir. 2021) (deciding, following the district court's grant of summary judgment for the defendant, that Washington's paid sick leave law was not preempted by the ADA), cert. denied 142 S. Ct. 2903 (2022); *Air Transport Ass'n of America, Inc. v. Meyer*, No. 24-cv-4623, 2026 WL 788673, at *4 (N.D. Ill. Mar 20, 2026) (denying the defendant's motion to dismiss A4A's claim that the ADA preempted Illinois' paid sick leave law and permitting the case to proceed to discovery where "it is plausible beyond speculation that a law regulating leave policies will upset th[e] balance [of staffing logistics]"); *Air Transport Ass'n of Am. v. Blissenbach*, No. 0:24-cv-04657 (D. Minn. May 15, 2025) (Order, ECF No. 54; Hrg. Tr., ECF No. 55 at PageID.34–37) (denying the defendant's motion to dismiss A4A's claim that the ADA preempted Minnesota's paid sick leave law and finding the allegations "sufficient to proceed to discovery"); *Air Transp. Ass'n of America, Inc. v. Moss*, No. 23-cv-02421, 2024 WL 4369137, at *6 (Dist. Colo. Sept 30, 2024) (denying the defendant's motion for judgment on the pleadings because A4A's claim that the ADA preempted Colorado's paid sick leave law was "fact-intensive" and permitting the case to proceed to discovery); *Air Transp. Ass'n of America v. Campbell*, No. 18-10651-ADB, 2023 WL 3773743, at *12 (D. Mass. June 2, 2023) (deciding, following a bench trial, that Massachusetts' paid sick leave law was preempted by the ADA because it "caus[ed] an increase in employees calling out

12

sick" and had "a clear and direct impact, which is not tenuous, remote or peripheral, on the availability of the Airlines' labor force and therefore their ability to provide . . . services to customers"); and *Delta Airlines, Inc. v. N.Y.C. Department of Consumer Affairs*, 564 F. Supp. 3d 109, 112 (E.D.N.Y. 2021) (deciding the preemption issue on summary judgment and holding that compliance with New York City's paid sick time law would have a potential impact on "the availability of flight attendants, and thus on-time flights, a core service of the airline," and thus was preempted by the ADA).  A4A is equally entitled to proceed to discovery on the facts alleged here.

For these reasons, the Court determines, under the required standard of review, that A4A's Complaint states a plausible claim to relief.  While the evidence accumulated during discovery may not ultimately support A4A's claim, the claim is not amenable to dismissal under Rule 12.

### III.  CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant's Motion to Dismiss (ECF No. 8) is DENIED.

**IT IS FURTHER ORDERED** that Defendant's answer to Plaintiff's Complaint (ECF No. 1) shall be filed not later than 14 days after entry of this Opinion and Order.

Dated:  June 22, 2026

/s/ Jane M. Beckering
JANE M. BECKERING
United States District Judge